UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                         :

LINDA LeTOUZEL,                              :
*on behalf of herself and all other employees similarly*  :
*situated,*                                       :

                                :
                Plaintiff,        :    Case No. 05-CV-6464 (MAT)
    - against -                    :
                                :    ECF CASE

THE EASTMAN KODAK COMPANY,    :

                                :
                Defendant.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT KODAK'S MOTION TO DISMISS THE COMPLAINTS IN PART AND TO STRIKE PLAINTIFFS' "CONSENT TO BECOME A PARTY PLAINTIFF"**

Dated: New York, New York
      December 6, 2005

*Of Counsel*:

    Lorie E. Almon
    Peter A. Walker
    Katherine E. Perrelli*
    Brett Bartlett*
    Christopher H. Lowe

*Local Counsel*:

    William G. Bauer

SEYFARTH SHAW LLP
1270 Avenue of the Americas, Suite 2500
New York, New York 10020-1801

WOODS, OVIATT, GILMAN, LLP
700 Crossroads Building, 2 State Street
Rochester, New York 14614

Attorneys for Defendant
Eastman Kodak Company

*Admission pending

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

I.    DISMISSAL MAY BE GRANTED ON THE PLEADINGS IN CLASS CASES. ............ 1

II.   § 901(b) PROHIBITS CLASS CERTIFICATION OF LABOR LAW CLAIMS.............. 4

III.  PLAINTIFFS LACK ARTICLE III STANDING. ............................................................. 6

IV.   PLAINTIFFS ARE NOT ADEQUATE CLASS REPRESENTATIVES. ......................... 6

V.    A MULTI-STATE CLASS ACTION IS INAPPROPRIATE IN THIS CASE.................. 7

VI.   INJUNCTIVE RELIEF IS NOT AVAILABLE UNDER THE FLSA.............................. 9

VII.  PLAINTIFFS' OPT-IN FORM IS OBJECTIONABLE. .................................................. 10

CONCLUSION ......................................................................................................................... 10

## <u>TABLE OF AUTHORITIES</u>

### CASES

In re Alliancebernstein Mut. Fund Excessive Fee Litig.,
    No. 04 Civ. 4885 (SWK), 2005 WL 2677753 (S.D.N.Y. Oct. 19, 2005)...........................6

Cameron-Grant v. Maxim Healthcare Services,
    347 F.3d 1240 (11th Cir. 2003) ....................................................................10

In re Crazy Eddie Sec. Litigation,
    135 F.R.D. 39 (E.D.N.Y. 1991) ....................................................................8

Denney v. Jenkens & Gilchrist,
    230 F.R.D. 317 (S.D.N.Y. 2005) ..................................................................8

Fears v. Wilhelmina Model Agency, Inc.,
    No. 02 CIV. 4911 (HB), 2003 WL 21659373 (S.D.N.Y. July 15, 2003) .......................2, 3

Frank v. Eastman Kodak Co.,
    228 F.R.D. 174 (W.D.N.Y. 2005)..................................................................5

General Telegraph Co. of the Southwest v. Falcon,
    457 U.S. 147 (1982)..............................................................................1, 2

Glass v. Kemper Corp.,
    920 F. Supp. 928 (N.D. Ill. 1996) ................................................................6

Kent-Chojnicki v. Runyon,
    180 F.R.D. 237 (W.D.N.Y. 1998)..................................................................6

Lorber v. Beebe,
    407 F. Supp. 279 (S.D.N.Y. 1976)................................................................2

Morisky v. Public Serv. Electric & Gas Co.,
    111 F. Supp. 2d 493 (D.N.J. 2000) ..............................................................10

Nelson v. Mustian,
    502 F. Supp. 698 (N.D. Fla. 1980)................................................................7

Ortiz v. Fibreboard Corp.,
    527 U.S. 815 (1999)...............................................................................6

Parker v. Time Warner Entertainment Co., L.P.,
    331 F.3d 13 (2d Cir. 2003).......................................................................2, 3

Robinson v. Metropolitan-North Commuter R.R.,
    267 F.3d 147 (2d Cir. 2001)................................................................8-9

Schlesinger v. Reservists Committee to Stop the War,
    418 U.S. 208 (1974)..........................................................................6

Scholtisek v. Eldre Corp.,
    229 F.R.D. 381 (W.D.N.Y. 2005).......................................................5

Schweizer v. Trans Union  Corp.,
    136 F.3d 233 (2d Cir. 1998)...............................................................1

Singer v. AT&T Corp.,
    185 F.R.D. 681 (2d Cir. 1982)............................................................8

Sirota v. Solitron Devices, Inc.,
    673 F.2d 566 ..............................................................................2-3

Steinberg v. Nationwide Mutual Insurance Co.,
    224 F.R.D. 67 (E.D.N.Y. 2004)..........................................................8

Sun Oil Co. v. Wortman,
    486 U.S. 717 (1988).........................................................................9

United States v. Moser,
    266 U.S. 236 (1924).........................................................................5

In re Visa Check/MasterMoney Antitrust Litigation,
    192 F.R.D. 68 (E.D.N.Y. 2000) .........................................................2

## DOCKETED CASES

Glewwe v. Eastman Kodak Co.,
    Case No. 05-CV-6462.......................................................................1

Luciano v. Eastman Kodak Co.,
    Case No. 05-CV-6463.......................................................................1

## FEDERAL STATUTES & RULES

29 U.S.C. § 216(b) ..............................................................................5, 10

Fed. R. Civ. P. 23 .............................................................................4, 5, 7, 10

Fed. R. Evid. 408 ..................................................................................5

**STATE RULE**

N.Y. C.P.L.R. § 901(b) (McKinney 2004) ................................................................................4, 5

**OTHER**

Gregory K. McGillivary, Wage and Hour Laws, A State-by-State Survey 1351 (BNA
        2004) ..............................................................................................................................9

Defendant Eastman Kodak Company ("Kodak") respectfully submits this reply memorandum of law in further support of its motion to dismiss the Complaints, in part, to strike the class action allegations, to dismiss the Complaints to the extent they seek injunctive relief and to strike Plaintiffs' form "Consent to Become a Party Plaintiff."[1]

## PRELIMINARY STATEMENT

This Court should disregard Plaintiffs' accusations that Kodak and its counsel have acted unethically by directing the Court to the legal deficiencies in Plaintiffs' Complaints.  Contrary to those accusations, Kodak properly cited to the relevant mandatory authority of this Circuit and the Court.  Perhaps distracted by their zeal to avoid the actual failures of their claims, Plaintiffs ignored, failed to distinguish, and/or entirely misinterpreted much of the authority that Kodak cited to support its arguments.  Plaintiffs attempt to obfuscate the facial deficiencies in their Complaints by injecting irrelevant issues of fact unnecessary to a determination of Kodak's dismissal motion.  Kodak's grounds for dismissal plainly involve issues of <u>law</u>, not a speculative range of facts that Plaintiffs think they may develop to support their claims. Plaintiffs' arguments should be rejected, and this Court should grant Kodak's motion to dismiss and motion to strike.

## I.   DISMISSAL MAY BE GRANTED ON THE PLEADINGS IN CLASS CASES.

There is no rule of law that would prevent this Court from dismissing Plaintiffs' deficient state law claims before considering whether class certification is proper absent discovery.  The

---

[1]  Kodak uses the same abbreviations throughout this reply as in its moving papers.  Kodak's initial Memorandum of Law in Support of its Motion to Dismiss the Complaint in Part and to Strike Plaintiff's "Consent to Become a Party Plaintiff," dated November 2, 2005, will be cited to herein as "Def. Mem."  Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss, dated November 28, 2005, will be cited to herein as "Pl. Opp."  Because Plaintiffs in <u>Luciano v. The Eastman Kodak Co.</u>, Case No. 05-CV-6463 (MAT) ("<u>Luciano II</u>"), and <u>Glewwe v. The Eastman Kodak Co.</u>, Case No. 05-CV-6462 (MAT) ("<u>Glewwe</u>") "rely on the response set forth in" the opposition papers for this case, the arguments made herein are also made in further support of Kodak's motion to dismiss and motion to strike in <u>Luciano II</u> and <u>Glewwe</u>. Accordingly, "Plaintiffs," as used herein, will refer to plaintiffs Linda LeTouzel, Peter Luciano, Rebecca Glewwe, and Christine Scanlon, except where otherwise indicated.

United States Supreme Court has recognized that "[s]ometimes the issues are plain enough from the pleadings."  General Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 160 (1982).  The Second Circuit Court of Appeals, moreover, has specifically held that a district court is not required to address class certification before determining a motion to dismiss.  Schweizer v. Trans Union Corp., 136 F.3d 233, 239 (2d Cir. 1998) ("There is nothing in Rule 23 which precludes the court from examining the merits of plaintiff's claims on a proper Rule 12 motion to dismiss … simply because such a motion  precedes resolution of the issue of class certification.").  Discovery certainly need not be taken before the Court determines a motion to dismiss on the pleadings. See General Tel. Co. of the Sw., 457 U.S. at 160.  Thus, the Second Circuit has flatly rejected Plaintiffs' argument that "Rule 23 issues cannot be decided until there has been a motion by the Plaintiffs as to the scope of the class they seek to certify." (Pl. Opp. at 8.)  Plaintiffs' counterintuitive argument that a motion to dismiss on the pleadings may not be determined before discovery is undertaken is similarly unavailing.[2]

Plaintiffs' reliance on Sirota v. Solitron Devices, Inc., 673 F.2d 566 (2d Cir. 1982) and Parker v. Time Warner Entm't Co., L.P., 331 F.3d 13 (2d Cir. 2003) is misplaced.[3]  First, the United States Supreme Court overruled Sirota in relevant part and instructed that this Court need not conduct discovery before dismissing class action allegations.  General Tel. Co. of the Sw., 457 U.S. at 160.  The impact of this ruling on Sirota has been recognized by a number of New York courts.  See Fears v. Wilhelmina Model Agency, Inc., No. 02 CIV. 4911 (HB), 2003 WL

---

[2]  Plaintiffs claim that "motions to dismiss are rarely granted" (Pl. Opp. at 4) and that "prior to discovery, dismissal of a complaint is premature" (Pl. Opp. at 5).  Plaintiffs do not support these strange assertions with legal authority.  The cases to which they cite provide the standard of review for a motion to dismiss, but do not suggest that motions on the pleadings are the futile device Plaintiffs contend that they are.

[3]  Kodak did not cite either of these decisions in its initial memorandum because one has been overruled and the other is entirely inapposite to the case at bar.

21659373, at *1-2 (S.D.N.Y. July 15, 2003) (Tab A)[4]; In re Visa Check/MasterMoney Antitrust

Litig., 192 F.R.D. 68, 79 (E.D.N.Y. 2000), aff'd, 280 F.3d 124 (2d Cir. 2001).  In particular, the

Fears court observed that "although Sirota may suggest that the Court must look beyond the

pleadings, the Supreme Court deemed, in its later opinion, that courts should take a flexible

stance, depending on circumstance, in regard to how much the Court must look beyond the

pleading, if at all." Fears, 2003 WL 21659373, at *2 (emphasis added).  Notably, Plaintiffs cite

Fears in their opposition papers without advising the Court that this case actually supports

Kodak's position.  (Pl. Opp. at 9.)  The decision in Parker is plainly limited to circumstances in

which the development of a factual record is necessary to a determination on class certification.

Parker, 331 F.3d at 21 (refusing to permit dismissal of class claims based on "assumptions of fact

rather than on findings of fact" where defendant Time Warner moved to dismiss on basis that

potential class of 12 million might be unmanageable).  Parker does not, as Plaintiffs suggest,

create black letter law that this Court may not dismiss class claims absent discovery.

Kodak's motion to dismiss Plaintiffs' state wage and contract claims does not rely on

speculative assumptions about the facts that may underlie those claims.  The motion, instead,

urges in part that the necessity of applying the substantive laws of 50 or more jurisdictions

causes Plaintiffs' Complaints to fail as a matter of law and/or calls for the Court to decline to

exercise supplemental jurisdiction.  The motion further urges that no legally cognizable causes of

action exist under one or more of Plaintiffs' claims.  The Court need not make any speculative

factual assumptions to determine these failings in Plaintiffs' Complaints, but may dismiss certain

---

[4]  For the Court's convenience, all decisions reported only on electronic databases cited herein
are attached hereto as Tabs A through B.

claims as a matter of law and decline to exercise supplemental jurisdiction over such claims.[5]

## II.    § 901(b) PROHIBITS CLASS CERTIFICATION OF LABOR LAW CLAIMS.

Kodak's argument that class certification of Plaintiffs' New York state labor law claims in LeTouzel and Luciano II is barred by CPLR § 901(b) is well supported by precedent in this State and this Circuit.  In its opening memoranda, Kodak cited nine cases, all from New York state and federal courts, that directly support this proposition and which remain good law.  (Def. Mem. at 4-6 (citing cases).)  As Kodak has informed the Court, New York courts, including this one, have not been uniform in their interpretation of § 901(b), and courts appear to be more willing to certify § 901(b) class actions where the right to recover liquidated damages has been explicitly waived.  (Def. Mem. at 6, n.3.)[6]  Those decisions that comport with the New York legislature's sound decision to prohibit class actions intended to recover penalties are, however, more consistent with well-reasoned class action jurisprudence that has applied substantive legislative instruction and ensured that a "representative" plaintiff does not make promises that will not be kept by the class members she seeks to represent (e.g., that all members of a putative class will waive the ability to seek penalties permitted by State law).

In any event, Plaintiffs fail to respond to Kodak's arguments that the growing split in authority regarding the unavailability of class action proceedings to recover under § 901(b) presents a substantial and compelling reason for this Court to decline to exercise supplemental jurisdiction over the New York Labor Law claims (an argument that was not raised – and, thus,

---

[5] This Court should not be distracted by Plaintiffs' citation to out-of-circuit authority proposing that class certification is typically (but not necessarily) challenged under Rule 23(c)(1).  Kodak has in fact moved in the alternative under Rule 23(c)(1).  (Def. Mem. at 1.)

[6]  While Kodak did not specifically cite to Robinson v. Eastman Kodak Co., Case No. 02-CV-6204 (Sept. 23, 2002) ("Robinson") – an unreported decision of which this Court is well-aware – Kodak cited to reported post-Robinson decisions, representing both sides of the conflicting lines of precedent.  (Def. Mem. at 4-6 (citing cases).)

not decided – in <u>Robinson</u>).[7]  (Def. Mem. at 6, n.3.)  Indeed, Plaintiffs do not cite to a Court of

Appeals decision resolving this issue definitively; their reliance on <u>Scholtisek v. Eldre Corp.</u>, 229

F.R.D. 381 (W.D.N.Y. 2005) is misplaced.  While the court in <u>Scholtisek</u> ultimately certified the

plaintiff's state labor law claims, the issue of whether § 901(b) prohibits certification of such

claims <u>was not before – and, thus, not decided by – the</u> court.  Plaintiffs misleadingly argue

further that Kodak "previously represented … that New York Labor Law claims *should* be

certified under Rule 23" in <u>Frank v. Eastman Kodak Co.</u>, 228 F.R.D. 174 (W.D.N.Y. 2005).  (Pl.

Opp. at 6) (emphasis in original).  The arguments and decision arising in <u>Frank</u> were "for the

sole purpose of settlement" between the parties (<u>id.</u> at 184), rendering <u>Frank</u> wholly irrelevant to

the application of § 901(b) in this case.  <u>See also</u> Fed. R. Evid. 408.

 Plaintiffs' contention that Kodak's § 901(b) defense is barred by collateral estoppel also

fails.  (Pl. Opp. at 6.)  Plaintiffs overlook the fact that issue preclusion does not attach to pure

rulings of law, like the Court's ruling on § 901(b) in <u>Robinson</u>.  <u>See</u> <u>United States v. Moser</u>, 266

U.S. 236, 242 (1924) ("Where, for example, a court in deciding a case has enunciated a rule of

law, the parties in a subsequent action upon a different demand are not estopped from insisting

that the law is otherwise, merely because the parties are the same in both cases.").  This Court

should dismiss Plaintiffs' New York Labor Law claims as a matter of law.  In the alternative, the

Court should decline supplemental jurisdiction over such claims.  In either case, this Court

should dismiss Plaintiffs' class action claims under § 901(b).

---

[7]  Nor do Plaintiffs address Kodak's argument that putative class members would only be able to
pursue liquidated damages by opting out of the alleged class, which underscores the inherent
conflict between Rule 23's opt-out class actions and the FLSA § 216(b)'s opt-in collective
action.  (Def. Mem. at 6.)

## III.    PLAINTIFFS LACK ARTICLE III STANDING.

Plaintiffs do not have standing to assert claims of harm under the laws of the states where

they were not employed or did not have contracts or agreements to perform work, as the laws of

those states have not applied to them.  See Kent-Chojnicki v. Runyon, 180 F.R.D. 237, 241

(W.D.N.Y. 1998).  As a matter of law, therefore, Plaintiffs cannot represent any putative Rule 23

class member allegedly harmed under the laws of those states where Plaintiffs were not

employed.  See, e.g., Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 216

(1974).  Because a matter may not proceed absent a plaintiff's standing to prosecute his or her

claims, the determination of standing is appropriately undertaken at the outset of litigation and

upon a motion to dismiss.[8]  Kent-Chojnicki, 180 F.R.D. at 241.

Here, if a class were certified, the substantive laws of the states where putative class

members have worked would determine whether each putative class member were permitted to

recover.  Plaintiffs have not worked in those states and therefore cannot represent putative class

members who worked only in those states.  Plaintiffs cannot deny that under these circumstances

they lack Article III standing to pursue claims in all fifty states and, accordingly, they are barred

from making such claims on their own behalf and on behalf of others.

## IV.    PLAINTIFFS ARE NOT ADEQUATE CLASS REPRESENTATIVES.

Requiring putative class members in Luciano II and LeTouzel to waive claims for

---

[8]  Contrary to Plaintiffs' suggestions, only in limited circumstances should the cart be placed in front of the horse and the class certification determination made before the determination of Article III standing.  Ortiz v. Fibreboard Corp., 527 U.S. 815, 831 (1999) (providing "limited exception" in unique and complex asbestos-related settlement class action where class certification would be "dispositive" of the case as a whole); In re Alliancebernstein Mut. Fund Excessive Fee Litig., No. 04 Civ. 4885 (SWK), 2005 WL 2677753, at *9 (S.D.N.Y. Oct. 19, 2005) (Tab B).  Plaintiffs argue throughout their opposition brief that this case does not raise any complex class action issues, and so should not be permitted the Ortiz exception for "extremely complex case[s] defying customary judicial administration."  Alliancebernstein, 2005 WL 2677753 at *9.

liquidated damages under New York law renders Plaintiffs inadequate class representatives

under Rule 23.  (Def. Mem. at 9.)  Plaintiffs dismiss Kodak's well-supported argument as

"frivolous," without addressing or distinguishing any of the cases cited by Kodak, which hold

that requiring such a waiver undermines a putative lead plaintiff's ability to "fairly and

adequately" represent others who have a statutory right to the remedy.  (Def. Mem. at 9 (citing

cases).)  Plaintiffs' statement that other courts, including the <u>Robinson</u> Court, have "permitted a

class to proceed" is not compelling, as the cases they cite did not present the same lack of

commonality, typicality, and adequacy of representation present here, where the laws of 50+

jurisdictions are implicated and because this argument was not even raised in <u>Robinson</u>, a case

limited only to New York employees.  Moreover, whether considering class propriety in the

context of employment discrimination or alleged breach of contract, courts have refused to allow

a plaintiff to represent a class where his or her employment situation is not typical of the putative

class members.  <u>See, e.g.</u>, <u>Nelson v. Mustian</u>, 502 F. Supp. 698, 704 (N.D. Fla. 1980) (plaintiff

was not an adequate class representative because her "individual case is so atypical as to make

her an inadequate representative of the class").

## V.     <u>A MULTI-STATE CLASS ACTION IS INAPPROPRIATE IN THIS CASE.</u>

Plaintiffs concede that where the substantive laws of the various states differ

fundamentally, multi-state class certification is not an efficient means to resolve the dispute.  (Pl.

Opp. at 17).  Plaintiffs untenably maintain, however, that class certification under their

circumstances is appropriate because the variations in state law are not so great as to defeat class

certification.  The cases relied upon by Plaintiffs to support their assertion are off-point, and

Plaintiffs have failed to establish similarities among the wage and contract laws of the 50 or

more jurisdictions under which they attempt to proceed.

Each of the cases that Plaintiffs cite concerning multi-state classes of breach of contract claims involve an identifiable nucleus of facts common to all putative class members, such as a single contract, identical contract, or overriding transaction.  See, e.g., Denney v. Jenkens & Gilchrist, 230 F.R.D. 317, 317 (S.D.N.Y. 2005) (certifying settlement-only class, noting that this distinguished the situation from the certification, where "variations in state law … might make a class-wide trial unmanageable "); Steinberg v. Nationwide Mut. Ins. Co., 224 F.R.D. 67, 77 (E.D.N.Y. 2004) (interpreting the same form insurance contract in 39 states); In re Crazy Eddie Sec. Litig., 135 F.R.D. 39, 41 (E.D.N.Y. 1991) (holding that in case brought by stock buyers alleging securities fraud, the issues relating to defendants' conduct will be common to the class regardless of the law applied); Singer v. AT&T Corp., 185 F.R.D. 681, 686 (S.D. Fla. 1998) (same overbilling for installation of same telephone equipment across all states).  Plaintiffs do not contest the fact that the alleged verbal and/or written contracts and agreements that would be at issue in Plaintiffs' cases are unquestionably varied and numerous, as they span differing kinds of workers and have been formed for different purposes and under distinctive circumstances.  Indeed, Plaintiffs have not identified a single agreement common to the putative class members.

Plaintiffs also fail to cite relevant authority to support their assertion that differences in damage calculations among states do not defeat multi-state class certification.  The sole case relied upon by Plaintiffs in this regard, Robinson v. Metro-North Commuter R.R., 267 F.3d 147 (2d Cir. 2001), involved a class of plaintiffs located only in the state of New York.  The court in Robinson was not challenged with reconciling allegations of entitlement to[9] and calculation of overtime, liquidated damages, penalties, interest and other relief under the 50 states' laws.

---

[9] For instance, Minnesota does not require overtime pay until an employee works 48 hours in a work week.  MINN. STAT. § 177.25, subd. 1 (West 2004).  Some states require overtime after 8 hours in a day (see, e.g., ALASKA STAT. § 23.10.060 (2002); CAL. LAB. CODE § 510 (West 2005)), while others look to a 40 hour threshold.

Fundamental differences in the underlying state wage and hour statutes underscore the

problematic nature of multi-state class certification and further demonstrates why this Court

should not exercise supplemental jurisdiction over the state law claims. While Plaintiffs purport

to bring this action only on behalf of those individuals who were not paid on a salary basis, such

individuals may nevertheless be considered exempt from protection under its own state wage

laws, while in other states, the law is still unsettled. See generally Gregory K. McGillivary,

Wage and Hour Laws: A State by State Survey (2004) (observing that 19 of the 52 U.S.

jurisdictions follow some type of salary basis test, in 7 states the law is still unsettled, and 26

states have not addressed the issue).[10] The Court would have to conduct individual state law

analyses of whether putative class members were exempt.

## VI.    INJUNCTIVE RELIEF IS NOT AVAILABLE UNDER THE FLSA.

Plaintiffs concede that they are not entitled to injunctive relief under the FLSA, but

disingenuously claim that they may be entitled to injunctive relief based on state claims.

Numerous state laws are implicated in determining whether injunctive relief may be permitted

and this arduous task would require the Court's individualized analysis and interpretation of

---

[10]  In Sun Oil Co. v. Wortman, 486 U.S. 717 (1988), the Supreme Court affirmed the application
of Kansas's statute of limitations to claims filed under the substantive laws of three other states,
where the claims would have been time-barred. Ruling that varying non-forum states'
substantive laws must be applied, the Court found that the statutes of limitations at issue in Sun
Oil were procedural, and made clear that it did "not hold that [the forum state] must apply its
own statute of limitations to a claim governed in its substance by another State's law, but only
that it may." 486 U.S. at 727. This permission does not apply to statutes of limitations that are,
as here, procedural and substantive – those that relate not only to time within which a plaintiff
may recover, but also to a defendant's ability to limit such recovery for reasons such as its good
faith attempts to comply with the law. See, e.g., MINN. STAT. § 541.07(5); ALASKA STAT. §
23.10.130. Moreover, Plaintiffs' and putative class members' contacts outside of New York
would compel the Court to choose to apply the statutes of limitations from those members' home
states. If Plaintiffs were permitted to avail themselves of New York's six-year statute of
limitations for individuals who never worked in New York, the Court would encourage
employees from across the nation to file wage-hour claims in this State.

each.  Plaintiffs' request for injunctive relief under the FLSA should be dismissed and the Court should decline supplemental jurisdiction over any state law claims for injunctive relief.

## VII.    PLAINTIFFS' OPT-IN FORM IS OBJECTIONABLE.

Any opt-in form used by individuals who consent to participate in this lawsuit as opt-in plaintiffs should be tailored to the circumstances of this case and subject to the parties' negotiation.  The opt-in form attached to Plaintiffs' Complaints is objectionable because it presupposes that this purported FLSA collective action is a representative action.  Respectfully, Kodak contests this presupposition: (a) because 29 U.S.C. § 216(b) requires individuals to opt in to a collective action to become party plaintiffs, and only then do they become empowered to proceed collectively, subject to individualized defenses or the decertification of the collective action, and (b) because this Court has not determined that Plaintiffs may represent any putative collective member.  See Cameron-Grant v. Maxim Healthcare Servs., 347 F.3d 1240, 1249 (11th Cir. 2003); Morisky v. Public Serv. Elec. & Gas Co., 111 F. Supp. 2d 493, 497 (D.N.J. 2000). Obviously, Plaintiffs' view is to the contrary.  To avoid an unnecessary and premature dispute about the form and content of any opt-in form to be used in this action, this Court should require the parties to negotiate and submit an agreed upon opt-in form after the Court determines whether it should conditionally certify Plaintiffs' claims as a §216(b) collective action.

### CONCLUSION

For all the foregoing reasons, the Court should grant Kodak's motion to dismiss the Complaints in part, and grant such other relief as the Court may deem just and proper.

Dated: New York, New York
        December 6, 2005

 /s/ Lorie E. Almon
Attorneys for Defendant

Local Counsel:

WOODS, OVIATT, GILMAN LLP     SEYFARTH SHAW LLP


By: /s/ William G. Bauer         By: /s/ Lorie E. Almon
    William G. Bauer            Lorie E. Almon
700 Crossroads Building          Peter A. Walker
2 State Street                 Katherine E. Perrelli*
Rochester, NY 14614           Brett Bartlett*
(585) 987-2811               Christopher H. Lowe
                              1270 Avenue of the Americas, Suite 2500
                              New York, New York  10020-1801
                              (212) 218-5500


Attorneys for Defendant Eastman Kodak Company


*Admission Pending

**TAB A**



Not Reported in F.Supp.2d, 2003 WL 21659373 (S.D.N.Y.), 61 Fed. R. Evid. Serv. 1451
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents

United States District Court,S.D. New York.
Carolyn FEARS, Donna Gibbs, Carole Alston,
Sharon Simon, and Tiffany Connor, Plaintiffs,
v.
WILHELMINA MODEL AGENCY, INC., et al.,
Defendants.
**No. 02 Civ.4911 HB.**

July 15, 2003.

Models sued agencies, alleging horizontal price fixing of commissions at 20%, in violation of New York law. Models moved for class action certification. The District Court, Baer, J., held that: (1) class was sufficiently identified; (2) common issues of fact applied to putative class members; (3) typicality requirement was satisfied; (4) adequacy of representation requirement was satisfied; and (5) common questions predominated over individual questions.

Motion granted.

West Headnotes

**[1] Federal Civil Procedure 170A** 🔑**181.5**

170A Federal Civil Procedure
   170AII Parties
      170AII(D) Class Actions
         170AII(D)3 Particular Classes Represented
            170Ak181.5  k.  Antitrust  Plaintiffs.
Most Cited Cases
Proposed class of models having oral or written contracts with modeling agencies was identified with sufficient specificity to allow for certification, in class action against agencies alleged horizontal price fixing and imposition of fees in excess of those allowed under New York law. Fed. Rules Civ. Proc., Rule 23.

**[2] Federal Civil Procedure 170A** 🔑**181.5**

170A Federal Civil Procedure
   170AII Parties
      170AII(D) Class Actions
         170AII(D)3 Particular Classes Represented
            170Ak181.5  k.  Antitrust  Plaintiffs.
Most Cited Cases
Class action certification requirement, that members of class share common questions of law and fact, was satisfied in suit by models against agencies, claiming that agencies engaged in horizontal price fixing scheme to charge models 20% commission rate that exceeded maximum of 10% imposed by state law. Fed. Rules Civ. Proc., Rule 23(a)(2).

**[3] Federal Civil Procedure 170A** 🔑**181.5**

170A Federal Civil Procedure
   170AII Parties
      170AII(D) Class Actions
         170AII(D)3 Particular Classes Represented
            170Ak181.5  k.  Antitrust  Plaintiffs.
Most Cited Cases
Typicality requirement for class action certification was satisfied, in suit brought by models alleging that agencies engaged in horizontal price fixing scheme to charge models 20% commission rate that exceeded maximum allowed under New York law, even though named plaintiffs had counterclaim exposure, and some did not earn much money through modeling. Fed. Rules Civ. Proc., Rule 23(a)(3).

**[4] Federal Civil Procedure 170A** 🔑**181.5**

170A Federal Civil Procedure
   170AII Parties
      170AII(D) Class Actions
         170AII(D)3 Particular Classes Represented
            170Ak181.5  k.  Antitrust  Plaintiffs.
Most Cited Cases
Adequacy of representation requirement for class action certification was satisfied, in suit brought by

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                        Page 2

Not Reported in F.Supp.2d, 2003 WL 21659373 (S.D.N.Y.), 61 Fed. R. Evid. Serv. 1451
**(Cite as: Not Reported in F.Supp.2d)**

models alleging that agencies engaged in horizontal price fixing scheme to charge models 20% commission rate that exceeded maximum allowed under New York law, despite claim that there was conflict between representatives, who were over 30, all female, had not earned much through modeling and were no longer active in profession, and majority of active models. Fed. Rules Civ. Proc., Rule 23(a)(4).

[5] **Federal Civil Procedure 170A** ⟨key⟩**181.5**

170A Federal Civil Procedure
   170AII Parties
     170AII(D) Class Actions
       170AII(D)3 Particular Classes Represented
         170Ak181.5  k.  Antitrust Plaintiffs.
Most Cited Cases
Requirement for class action certification, that common questions predominate over individual, was satisfied in suit by models claiming that agents engaged in horizontal price fixing scheme to charge them 20% commission rate that exceeded maximum allowed under New York law, despite claim that by nature of industry each contract was individualized; contractual sampling showed that 95% involved 20% commission rate. Fed. Rules Civ. Proc., Rule 23(b)(3).

OPINION & ORDER

BAER, J.
**\*1** Plaintiffs FN1 move to certify this matter as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure. Defendants oppose the motion on the grounds that plaintiffs have failed to show commonality, typicality, adequacy of representation, and predominance of law and fact. For the following reasons, plaintiffs' motion is granted.

> FN1. Pursuant to a May 21, 2003 Order, plaintiffs' counsel dismissed without prejudice all plaintiffs who are no longer named on the latest amended complaint or who do not have damages within the applicable statute of limitations period.

Accordingly, this action was re-captioned to reflect the present named plaintiffs in the latest amended complaint.

I. LEGAL STANDARDS

A. Class Certification

Plaintiffs bear the burden of proving that the putative class has satisfied all four prerequisites of Rule 23(a) and at least one of the requirements of Rule 23(b). *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Caridad v. Metro-North Commuter RR,* 191 F.3d 283, 291 (2d Cir.1999). Rule 23(a) requires that:(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a). In addition, the party seeking class certification under Rule 23(b)(3) must show that common questions of law or fact predominate and that a class action is a superior means to adjudicate the claims. Fed.R.Civ.P. 23(b)(3).

B. Level of Inquiry

In deciding a motion for certification, the court should accept the underlying allegations in the complaint as true. *Shelter Realty Corp. v. Allied Maintenance Corp.,* 574 F.2d 656, 661 n. 15 (2d Cir.1978). A court may examine not only the pleadings, but also the evidentiary record and any affidavits and other results of pre-certification discovery. *Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 571 (2d Cir.1982). Defendants contend that I must perform a fact intensive inquiry, going beyond the complaint to decide whether to certify the putative class action before me. Defendants note that the Second Circuit had commented that "in making a certification decision, a judge must look somewhere 'between the pleading and the fruits of discovery.... (E)nough must be laid bare to let the judge survey the factual scene on a kind of sketchy

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 21659373 (S.D.N.Y.), 61 Fed. R. Evid. Serv. 1451
**(Cite as: Not Reported in F.Supp.2d)**

relief map, leaving for later view the myriad of details that cover the terrain." ' *Sirota,* 673 F.2d at 571-72 (citing *Professional Adjusting Systems of America, Inc. v. General Adjustment Bureau, Inc.,* 64 F.R.D. 35, 38 (S.D.N.Y.1974)). The United States Supreme Court, after *Sirota,* stated in *General Telephone Co. of the Southwest v. Falcon,* 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982):

*Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.* Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation. For such an order, particularly during the period before any notice is sent to members of the class, "is inherently tentative." This flexibility enhances the usefulness of the class-action device; actual, not presumed, conformance with Rule 23(a) remains, however, indispensable.

**\*2** *Id.* at 160 (emphasis). Thus, although *Sirota* may suggest that the Court must look beyond the pleadings, the Supreme Court deemed, in its later opinion, that courts should take a flexible stance, depending on circumstance, in regard to how much the Court must look beyond the pleading, if at all, to decide whether to certify a class action. "In some cases, it may be possible to conduct the required inquiry by looking no further than the pleading," *In re Visa Check/Mastermoney Antitrust Litig.,* 192 F.R.D. 68, 79 (E.D.N.Y.2000), whereas in other instances, plaintiffs may not rest solely on the complaint. *See Pecere v. Empire Blue Cross & Blue Shield,* 194 F.R.D. 66, 70 (E.D.N.Y.2000). Although defendants have maintained and continue to characterize plaintiffs' complaint as thread bare in facts and full of conclusory statements, which fails to meet the minimal pleading requirements of Rule 8(a), I find, as further discussed below, that the allegations set forth within the complaint along with the material incorporated by reference and other pre-certification discovery materials, including the Expert Report of Martin Asher, submitted with plaintiffs' motion is adequate, at this juncture, to support this Court's analysis and decision to certify the proposed class.

## II. DISCUSSION FN2

> FN2. The Court assumes familiarity with the facts and allegations by plaintiff, as set forth in *Masters v. Wilhelmina Model Agency, Inc. .,* 2003 WL 1990262 (S.D.N.Y. Apr 29, 2003) and *Masters v. Wilhelmina Model Agency, Inc.,* 2003 WL 145556 (S.D.N.Y. Jan 17, 2003), and will not repeat them here.

Defendants argue that the putative class should not be certified because plaintiffs have allegedly failed to provide or show: (1) a precise and definite definition of the class; (2) common impact on putative class members; (3) typicality and adequacy to meet the requirements of Rule 23(a); and (4) the proposed class action is not the best way to proceed as required by Rule 23(b)(3). I find all of defendants' arguments to be without merit.

### A. Ascertainability of the Class

[1] As a preliminary issue, defendants' claim that the instant matter cannot be certified as a class action because plaintiffs' definition of the class is too indefinite to determine whether a particular individual is a member of the proposed class. " [W]hile Rule 23(a) does not expressly require that a class be definite in order to be certified, a requirement that there be an identifiable [aggrieved] class has been implied by the courts." *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liability Litig.,* 209 F.R.D. 323, 336 (S.D.N.Y.2002) (internal quotes and citations omitted); *Dunnigan v. Metropolitan Life Ins. Co.,* 214 F.R.D. 125, 135 (S.D.N.Y.2003). "An identifiable class exists if its members can be ascertained by reference to objective criteria." *MTBE Prods.,* 209 F.R.D. at 336 . Membership should not be based on subjective determinations, such as the subjective state of mind of a prospective class member, but rather on objective criteria that are administratively feasible

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 21659373 (S.D.N.Y.), 61 Fed. R. Evid. Serv. 1451
**(Cite as: Not Reported in F.Supp.2d)**

for the Court to rely on to determine whether a particular individual is a member of the class. *Id.* Further, the Court "must be able to make this determination without having to answer numerous fact-intensive inquiries." *Id.* at 336 n. 20 (quoting *Daniels v. City of New York,* 198 F.R.D. 409, 414 (S.D.N.Y.2001). Although members of the class need not be ascertained before the class certification, they "must be ascertainable at some point in the case." *MTBE Prods. Liability,* 209 F.R.D. at 337 (quoting *Rios v. Marshall,* 100 F.R.D. 395, 403 (S.D.N.Y.1983); *Ashe v. Board of Elections in the City of New York,* 124 F.R.D. 45, 47 (E.D.N.Y.1989).

**\*3** Here, plaintiffs propose a class consisting of "all current and former models who have or had oral or written contracts with any of the Defendants during the Class Period." FN3 Third Am. Compl. ¶ 31. Defendants contend that it is a "vague and unworkable definition of the proposed class." Def. Mem. at 9. I disagree. The class definition, as worded above, is sufficiently definite that the members can be objectively identified. Although those with oral contracts may be more difficult to identify compared to those with written contracts, it should still be administratively feasible to identify them, based on booker records and other objective criteria. In view of the allegations in the complaint, which I must take to be true, that defendants conspired to violate the antitrust laws by engaging in horizontal price fixing and charging commissions above those permitted by New York state law, plaintiffs have, at least for now, established the existence of an aggrieved class, whose members can be readily ascertained under the definition provided.

> FN3. The Class Period runs from June 25, 1998. *Masters,* 2003 WL 1990262, at \*3

### B. Satisfaction of Rule 23(a)

#### 1. Numerosity

Defendants do not dispute that the proposed class is so numerous that joinder of all members is impractical. In fact, from the deposition testimony of Katie Ford, CEO of defendant Ford Models, Inc. ("Ford Models"), the number of models working for Ford Models who would be class members, appears to number in the thousands. Katie Ford Depo. at 8, 9, 11, 12, 14, 17. There is a strong likelihood that the number of class members is substantially greater in view of the other defendants in this lawsuit The numerosity requirement under Rule 23(a)(1) is met.

#### 2. Common questions of law and fact

**[2]** Plaintiffs allege in their complaint that defendants engaged in a horizontal price fixing conspiracy to charge virtually all models commission rates of 20%, in excess of the 10% rate permitted by state law for employment agencies. The existence of this alleged conspiracy, whether defendants are employment agencies subject to N.Y. General Business Law §§ 170-190 (1988) (" Article 11"), whether the conspiracy set a 20% commission rate that violates the antitrust laws, and the amount of the artificiality of rates, stand, among other issues, as common questions of law or fact, which satisfy the commonality requirement under Rule 23(a)(2). *See In re Auction Houses Antitrust Litig.,* 193 F.R.D. 162, 164 (S.D.N.Y.2000); *see also Arden Architectural Specialties, Inc. v. Washington Mills Electro Minerals Corp.,* 2002 WL 31421915, at \*4 (W.D.N.Y. Sept.17, 2002); *In re Playmobil Antitrust Litig.,* 35 F.Supp.2d 231, 241 (E.D.N.Y.1998)("It is well established that class actions are particularly appropriate for antitrust litigation concerning price-fixing schemes because price-fixing presumably subjects purchasers in the market to common harm." (citing *In re Plastic Cutlery Antitrust Litig.,* 1998 WL 135703, at \*2 (E.D.Pa.1998)); *In re Alcoholic Beverages Litig.,* 95 F.R.D. 321, 324 (E.D.N.Y.1982) ("The very nature of the case-involving allegations of antitrust conspiracy among defendants-appears to insure that the commonality requirement is satisfied.").

#### 3. Typicality

**\*4 [3]** Rule 23(a)(3) requires that the claims asserted by plaintiffs be typical of the claims of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 21659373 (S.D.N.Y.), 61 Fed. R. Evid. Serv. 1451
**(Cite as: Not Reported in F.Supp.2d)**

other proposed class members. "Typicality refers to the nature of the claim of the class representatives and not to the specific facts from which the claim arose or relief is sought." *In re NASDAQ Market-Makers Antitrust Litig.,* 169 F.R.D. 493, 510 (S.D.N.Y.1996). The proper inquiry is whether "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Dreyfus Aggressive Growth Mut. Fund Litig.,* 2000 WL 1357509, at *3 (S.D.N.Y. Sept.20, 2000) (citing *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 291 (2d Cir.1992)); *see also Dura-Bilt Corp. v. Chase Manhattan Corp.,* 89 F.R.D. 87, 99 (S.D.N.Y.1981) (typicality is satisfied if "members of the [proposed] class have the same or similar injury" as the proposed class representatives). Defendants argue that the typicality requirement is not met because the proposed class representatives suffer individual flaws that bar them from being proper class representatives. Namely, several putative class representatives did not read the entire complaint, several are subject to counterclaims or defenses, several purportedly lied about their age, several allegedly were unable to provide any evidence of the alleged unlawful conspiracy, several have at most a tangential relationship with the New York modeling industry, most have not spoken to or contacted other models under the age of 30 or current New York models to determine if they support the action, and none are male. *See* Def. Mem. at 19-20. Defendants fail to grasp that " [t]ypicality refers to the *nature of the claims* of the representative, not the individual characteristics of the plaintiff[s]. Personal traits or variables ... are irrelevant to the typicality criterion." *Playmobil,* 35 F.Supp.2d 231, 242 (E.D.N.Y.1998). Put another way, none of these examples changes my view that the antitrust claims brought by plaintiffs are "the same or similar" to that of other members of the proposed class. Although some of the proposed representatives' may be subject to counterclaims or defenses, that fact alone will not defeat typicality. *Davis v. Cash for Payday, Inc.,* 193 F.R.D. 518, 521-22 (N.D.Ill.2000); *Dreyfus Aggressive Growth,* 2000 WL 1357509, at *6. I am unconvinced, and indeed believe it unlikely, that the potential counterclaims or defenses will threaten to become a

focus of the litigation here, which might make class certification inappropriate. *See Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 903 F.2d 176, 180 (2d Cir.1990).

Defendants further contend that each of the plaintiffs, within the limitations period, worked full time for model management companies in Philadelphia or California, and imply that the plaintiffs could not have incurred damages from defendants' conduct during the relevant time period. The invoices and engagement letters signed by Donna Gibbs, Pl. Suppl. Exh. A, Carole Alston, *id.* at Exh. B, Sharon Simon, *id.* at Exh. C, Carolyn Fears, *id.* at Exh. J, and Tiffany Connor, *id.* at Exh. K, however, show that they signed contracts with defendants within the limitations period, and indeed were charged a 20% commission rate and the cost of various expenses in the relevant time frame. Plaintiffs have demonstrated that each of them have standing to bring the instant lawsuit.

**\*5** Defendants contend, in the alternative, that even if plaintiffs had incurred damages within the limitations period, plaintiffs are not qualified to be the proposed class representatives because the " quantity and quality of the [ ] modeling services [they rendered] is [sic] insufficient to support their viability as class representatives." Elite Model Mgmt. June 10, 2003 Letter. More specifically, defendants claim that because the proposed class representatives have made rather modest sums of money from modeling, they cannot satisfy the typicality requirement for class certification. Defendants are incorrect. "[I]t is settled in this Circuit that factual differences in the *amount of damages,* date, size or manner of [payment], ... and other such concerns will not defeat class action certification when plaintiffs allege that the same unlawful course of conduct affected all members of the proposed class. *In re Sumitomo Copper Litig.,* 182 F.R.D. 85, 92 (S.D.N.Y.1998) (emphasis added) (citing *Green v. Wolf,* 406 F.2d 291, 299-301 (2d Cir.1968)); *see also Continental Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater New York, Inc.,* 198 F.R.D. 41, 45 (E.D.N.Y.2000) ( "Differences in the amount of damages sustained by individual class members usually will not defeat class certification.")(citing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 21659373 (S.D.N.Y.), 61 Fed. R. Evid. Serv. 1451
**(Cite as: Not Reported in F.Supp.2d)**

*Playmobil,* 35 F.Supp.2d at 242). Here, plaintiffs have alleged in their complaint that defendants conspired to evade state pricing regulation laws by repackaging themselves as model management companies, when in reality they remained in substance employment agencies, still subject to the state's laws. Pursuant to the objectives of the alleged conspiracy to evade the pricing regulations, defendants allegedly set commission rates at artificially high prices, which was assessed virtually across the board, *see* Asher Affid. ¶¶ 13-16, and agreed to charge models various expenses that would have otherwise been plainly precluded or limited by state law, but for the conspiracy. Thus, the alleged actions undertaken by defendants to evade the state pricing laws and evade detection of such violations stand as unlawful conduct that affected all members of the proposed class, including the few models who may have even been able to negotiate rates below the industry "standard, " *i.e.,* currently 20%. All of the plaintiffs and proposed class members make the same or similar claims of antitrust violations arising from the same course of conduct committed by defendants, and thus, the typicality requirement of Rule 23(a)(3) is satisfied.

### 4. Adequacy of representation

[4] Rule 23(a)(4) requires that the class representatives be adequately representative of the class. To qualify, plaintiffs must show that the interests of the putative class representatives: (1) do not conflict with the class members' interests, and (2) the representatives and their attorneys must be able to prosecute the action vigorously. *General Tel. Co.,* 457 U.S. at 157. Defendants observe that the class representatives are all female, over the age of 30, who allegedly earned "minimal" sums of money over their career or are purportedly "no longer active in the modeling industry." Def. Mem. at 21. "The mere fact that a representative plaintiff stands in a different factual posture is not sufficient to refuse certification ... The atypicality or conflict must be clear and must be such that the plaintiff's interests are placed in significant jeopardy." *Hedges Enterprises, Inc. v. Continental Group, Inc.,* 81 F.R.D. 461, 466 (E.D.Pa.1979); *see also NASDAQ,*

169 F.R.D. at 513. I do not find that the representative plaintiffs' gender, age, amount of money earned, quantity of work performed for defendants, or currently modeling inactivity, create such a conflict that "is apparent, imminent, and on an issue at the very heart of the suit," *NASDAQ,* 169 F.R.D. at 513, as to defeat their ability to adequately represent the interests of the other class members. Furthermore, none of the alleged flaws raised by defendants in connection with typicality convince me that plaintiffs, who have taken time to consult with their counsel and undergo depositions, do not understand their role in this litigation or are unable or unwilling to vigorously pursue their claims here. *See Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52, 62 (2d Cir.2000) (finding individual who had knowledge of the subject matter of the litigation and was willing and able to work with counsel to litigate the action is an adequate class representative).

**\*6** Defendants note that some of the models perform free lance and thus "they have a vested interest in destroying the model management companies" because they would then have more modeling opportunities. Def. Mem. at 24. Furthermore, defendants note several of the models spent virtually their entire career outside of New York, and contend that plaintiffs have failed to supply any evidence that the representatives share the same interests as active models in the continuing vitality of New York's modeling industry. Notwithstanding defendants' prognosis of a potential conflict, I find insufficient evidence to conclude that the proposed conflict, if any, is "so palpable as to outweigh the substantial interest of every class member in proceeding with the litigation. " *Littlewolf v. Hodel,* 681 F.Supp. 929, 936-37 (D.D.C.1988). All the class members share a common interest in proving the existence, scope and effect of defendants' ongoing price fixing, which allegedly led to inflated and unlawful commission rates and expenses. Furthermore, I find that Boies, Schiller, & Flexner, which has taken a leading role in representing plaintiffs, are experienced counsel, and I find nothing to suggest that the firm would be unqualified to conduct the proposed class action and adequately protect the interests of the putative class.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 21659373 (S.D.N.Y.), 61 Fed. R. Evid. Serv. 1451
**(Cite as: Not Reported in F.Supp.2d)**

### C. Satisfaction of Rule 23(b)(3)

[5] To certify a class action under Rule 23(b)(3), a court must find that common issues of law and fact predominate. The predominance requirement will be generally met along with typicality unless "it is clear that individual issues will overwhelm the common questions." *NASDAQ,* 169 F.R.D. at 517. To prevail on this point, courts have required plaintiffs to establish that common proof will predominate with respect to (1) defendants' alleged violations of the antitrust laws, (2) direct antitrust injuries suffered by plaintiffs as a result of the violations, and (3) the extent the injuries can be quantified with the requisite precision. *Id.*

Plaintiffs have alleged the existence of a single conspiracy, and thus the relevant proof of this will not vary among class members. Accordingly, this action clearly presents a common question that is fundamental to all class members. *Id.* ("Courts repeatedly have held that the existence of a conspiracy is the predominant issue in price fixing cases, warranting certification of the class even where significant issues are present.").

Defendants contend that "[a]s a result of the personal services rendered by the models to their customers, and the personal services that are rendered to the models by the defendants, individualized inquiries are necessary to determine both liability and damage issues." Def. Mem. at 26. Defendants claim that because each model is unique, with different looks, talent, gender, age, and place of residence, and managed differently, there are no "regular" services provided to models. Defendants cite a handful of cases where the court determined that the putative class could not be certified because the issue of injury and damages could not be reconciled. *See Ambrook Enter. v. Time Inc.,* 612 F.2d 604 (2d Cir.1979), *National Auto Brokers Corp. v. General Motors. Corp.,* 60 F.R.D. 476 (2d Cir.1973); *Continental Orthopedic Appliances v. Health Ins. Plan of Greater New York, Inc.,* 198 F.R.D. 41 (E.D.N.Y.2000); *Kennett Corp. v. Massachusetts Furniture and Piano Movers Ass'n, Inc.,* 101 F.R.D. 313 (D.Mass.1984); *Dafforn v. Rousseau Assocs., Inc.,* 1976 WL 1358 (N.D.Ind.1976). In each of these cases, the defendant engaged in activities from which the issue of injury could not be determined from any kind of general proof or formulae. That does not appear to be the case here. *See* Asher Affid. ¶ 19. Defendants suggest that because they provide a range of services that may vary amongst plaintiffs, the determination of actual injury cannot be dealt with on a group basis. Unlike the cases they cite, however, defendants present no evidence here to support the gravamen of their allegation, *i.e.,* the commission rates vary according to the services required, which might make determination of liability and damages more difficult. *See, e.g., Kennett,* 101 F.R.D. at 317 (distinguishing cases where the fee charged was fixed, regardless of services expended, and thus the service could be viewed as a homogeneous product, with cases where the pricing varied on an individual basis and was not subject to class certification). A sampling of contracts with defendants show that around 95% or more of all models, with whom defendants contracted, were paid the "industry standard" 20% commission rate. *See* Asher Affid. ¶ 16; *see also id.* ¶ 13 (deposition testimony indicating that between 96 to 98 1/2 percent of all Ford models pay commissions equal to 20%). Given the plethora of differences between models, as laundry listed by defendants, the overwhelming number of models charged the same rate belies any claim that the rate vary as a function of services needed. Defendants neither suggest nor adduce evidence, which might reflect that this practice of charging a flat rate has changed. In regard to injury, the defendants allegedly conspired to fix benchmark commission rates and charge unlawful expenses, and thereby injure class members by making them pay fees and expenses that are disallowed by the federal antitrust laws. Whether the commissions charged were higher or lower than the commissions that would have been charged in the absence of the alleged conspiracy requires common proofs here. "Neither a variety of prices nor negotiated prices is an impediment to class certification if it appears that plaintiffs may be able to prove at trial that, as here, the price range was affected generally." *NASDAQ,* 169 F.R.D. at 522. Plaintiffs allege that the majority of plaintiffs were charged a 20% commission, and that for those who were able to negotiate a different rate, they began from the artificially elevated rate of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 21659373 (S.D.N.Y.), 61 Fed. R. Evid. Serv. 1451
**(Cite as: Not Reported in F.Supp.2d)**

20%. Assuming these allegations are true, "the proof with respect to the 'base' price from which these negotiations began, or the structure of the conspiracy to affect individual negotiations, would be common to the class. Accordingly ... the fact of damage is predominantly, if not entirely, a common question." *Hedges Enterprises, Inc. v. Continental Group, Inc.,* 81 F.R.D. 461, 475 (E.D.Pa.1979).

**\*7** Although defendants' expert, Robert Larner, opines that there are flaws in the analysis and conclusion by plaintiffs' expert, Martin Asher, in finding class-wide impact, I find there is sufficient reliable foundation in Asher's methodology, at this preliminary stage, to find that there is a common class-wide injury that predominates and that this injury can be quantified with the requisite precision. Even if it should turn out later that certain damages must be determined on an individualized basis, that does not preclude class action certification where, as here, common issues, which define liability, predominate. *NASDAQ,* 169 F.R.D. at 524; *see also Shelter Realty,* 75 F.R.D. at 37. In addition, because of the number of individuals in the proposed class who may have claims against defendants, a class action is clearly a superior and more efficient means to adjudicate this action. The requirements of Rule 23(b)(3) are therefore met.

### III. CONCLUSION

For the foregoing reasons, plaintiffs' motion to certify the putative class action under Rule 23(b)(3) and appoint plaintiffs as class representatives is granted. Boies, Schiller & Flexner is approved as lead class counsel. Fully briefed dispositive motions, if any, remain due on or before September 15, 2003, and the trial for this class action is scheduled on my December 2003 trailing trial calendar.

SO ORDERED.

S.D.N.Y.,2003.
Fears v. Wilhelmina Model Agency, Inc.
Not Reported in F.Supp.2d, 2003 WL 21659373 (S.D.N.Y.), 61 Fed. R. Evid. Serv. 1451

Briefs and Other Related Documents (Back to top)

• 2004 WL 2973905 (Trial Motion, Memorandum and Affidavit) Corrected Plaintiffs' Memorandum in Opposition to Defendant Next's Motion for Impaneling Two Separate Juries (May. 13, 2004)
• 2004 WL 2973904 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Further Support of Defendant Click Model Management, Inc.'s Motion for Reconsideration (May. 03, 2004)
• 2004 WL 2973903 (Trial Motion, Memorandum and Affidavit) Defendant Next's Reply Memorandum of Law in Support of Its Motion for Impaneling Two Separate Juries (Apr. 26, 2004)
• 2004 WL 2973902 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendant Click Model Management, Inc.'s Motion for Reconsideration (Apr. 14, 2004)
• 2004 WL 2973901 (Trial Motion, Memorandum and Affidavit) Defendant Next's Reply Memorandum in Support of Its Motion for Reconsideration (Apr. 08, 2004)
• 2004 WL 2973900 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Opposition to Defendant Next's Motion for Reconsideration (Apr. 07, 2004)
• 2004 WL 2973890 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendants' Motion in Limine to Exclude Expert Testimony of Dr. Martin Asher (Mar. 31, 2004)
• 2004 WL 2973891 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendants' Motion in Limine Regarding Plaintiffs' Use of the Term ""Models, Inc." to Refer to Defendants (Mar. 31, 2004)
• 2004 WL 2973892 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendants' Motion in Limine to Exclude Any Evidence of and Reference to Defendant Boss Models, Inc.'s, Default Judgment (Mar. 31, 2004)
• 2004 WL 2973893 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Opposition to Plaintiffs' Motion in Limine to Preclude Defendants from Arguing or Submitting Evidence to the Jury Concerning the Absence of Regulatory or Other Law Enforcement Proceedings Against Defendants (Mar. 31, 2004)
• 2004 WL 2973894 (Trial Motion, Memorandum and Affidavit) Defendants' Consolidated

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 21659373 (S.D.N.Y.), 61 Fed. R. Evid. Serv. 1451
**(Cite as: Not Reported in F.Supp.2d)**

Memorandum of Law in Opposition to Plaintiffs' Motions (1) to Strike or Limit Testimony of Dr. Janusz A. Ordover and (2) to Preclude Defendants from ""Presenting Evidence or Arguments Purporting to Justify Their Charging a Co mmission in Excess of Competitive Rates, Their Collusion with Respect Thereto, the Purported Necessity Thereof, or the Fact That Defendants' Would Not be Able to Stay in Business or Offer Services in the Absence Thereof" (Mar. 31, 2004)

• 2004 WL 2973895 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion in Limine to Allow Admission of Full Range of Evidence Relating to Defendants' Involvement and Participation in Collusive Activities Relating to Modeling Services (Mar. 31, 2004)

• 2004 WL 2973896 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendants' Motion in Limine to Exclude the Testimony of Dr. John C. Beyer (Mar. 31, 2004)

• 2004 WL 2973897 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendants' Motion in Limine to Exclude Evidence of Alleged Conspiracies and Agreements Other Than That of the Alleged Conspiracy to Fix Model' Commission Rates (Mar. 31, 2004)

• 2004 WL 2973898 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendants' Motion in Limine to Exclude the Affirmation of Ira Levinson and Verified Answer of Elite (Mar. 31, 2004)

• 2004 WL 2973899 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendants' Motion in Limine to Exclude Draft Imma Minutes (Mar. 31, 2004)

• 2004 WL 3559781 (Trial Motion, Memorandum and Affidavit) Memorandumn of Law in Support of Defendants' Motion in Limine to Exclude the Testimony of Dr. John C. Beyer (Mar. 31, 2004)

• 2004 WL 2973884 (Trial Pleading) (Mar. 30, 2004)

• 2003 WL 24174599 (Trial Pleading) Plaintiffs' Response to Defendants' Motion for Summary Judgment (Dec. 15, 2003)

• 2003 WL 24174603 (Trial Motion, Memorandum and Affidavit) Affirmation of Olav A. Haazen in Oppositon to Defendants' Motions for Summary Judgment Pursuant to Fed. R. Civ. P. 56(e) (Dec. 15, 2003)

• 2003 WL 23951401 (Trial Pleading) Answer (Oct. 14, 2003)

• 2003 WL 23951400 (Trial Pleading) Answer of Defendant Ford Models, Inc. (May. 28, 2003)

• 2003 WL 23951399 (Trial Pleading) Third Consolidated Amended Complaint (Apr. 30, 2003)

• 1:02CV04911 (Docket) (Jun. 25, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB B**



Slip Copy, 2005 WL 2677753 (S.D.N.Y.)
**(Cite as: Slip Copy)**

Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
In re ALLIANCEBERNSTEIN MUTUAL FUND
EXCESSIVE FEE LITIGATION
**No. 04 Civ. 4885(SWK).**

Oct. 19, 2005.

OPINION

KRAM, J.

I. INTRODUCTION

**\*1** Twenty-nine named Plaintiffs filed a class action and derivative suit against Alliance Capital Management, L.P. ("Alliance"), the investment adviser of the AllianceBernstein mutual funds (the "Funds"). Plaintiffs accuse Alliance of charging shareholders excessive advisory fees in breach of its duty as a fiduciary. On April 14, 2005, Defendants moved to dismiss for failure to state a claim upon which relief may be granted.

A. The Parties

Plaintiffs bring their Investment Company Act ("ICA") and common law claims on behalf of "all persons or entities who held shares or other ownership units of AllianceBernstein Funds" during the class period. (Am.Compl.¶¶ 1, 175.) FN1 Plaintiffs bring their Investment Advisers Act of 1940 ("IAA") claims derivatively, on behalf of fifty-one individual AllianceBernstein mutual funds, each of which were formed as either Maryland corporations or Massachusetts business trusts.

> FN1. The Amended Complaint mistakenly describes two different class periods. On one occasion it describes the class period

as lasting from June 22, 1999 to November 17, 2003. (Am.Compl.¶ 1.) On another, it states that the period lasted from June 22, 1999 to March 22, 2004. (Am.Compl.¶ 175.)

Alliance is a registered investment adviser providing diversified investment management services to a broad range of individual investors, institutional investors, and private clients. It operates in four business segments, which include Institutional Investment Management Services, Private Client Services, Retail Services, and Institutional Research Services. In all, Alliance manages client accounts with assets totaling approximately $426 billion.

The Amended Complaint also names Alliance's corporate affiliates as co-defendants. Alliance Capital Management Holdings, L.P. ("Alliance Capital") conducts its diversified investment management services through Alliance. Defendant AXA Financial Inc. ("AXA") is a Delaware corporation engaged in financial protection and wealth management. Defendant Alliance Capital Management Corporation ("ACMC"), an indirect wholly-owned subsidiary of AXA, conducts a diversified investment management services business. AllianceBernstein Investment Research Management, Inc. ("ABIRM") is the distributor of the Funds. Alliance, Alliance Capital, and ACMC are collectively referred to as the "Advisers."

In addition, Plaintiffs name seven current or former directors of the AllianceBernstein mutual funds as defendants. John D. Carifa, Ruth Block, David H. Dievler, John H. Dobkin, William H. Foulk, Jr., Clifford L. Michel, and Donald J. Robinson were directors or officers of the Funds during the class period and are collectively referred to as the "Directors." Finally, Plaintiffs name John Does 1-100 as defendants. These individuals include any wrongdoers whose identities have yet to be ascertained.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

### B. The Amended Complaint

The Amended Complaint alleges that Alliance charged undisclosed fees to investors and used the revenue to pay brokerages to steer prospective clients toward AllianceBernstein mutual funds. This practice, known as buying "shelf space," produced an insurmountable conflict of interest for Alliance in its role as an investment adviser. Because Alliance's management commission was calculated as a percentage of the overall value of the Funds, it had a strong incentive to stimulate additional investment. Plaintiffs assert that this practice served to inflate Alliance's management fees at the expense of investor holdings.

**\*2** The Amended Complaint describes the methods used by Alliance to purchase shelf space at various brokerages. FN2 First, Alliance awarded its business to specific firms that agreed to aggressively push AllianceBernstein funds, a practice known in the industry as "directed brokerage." This arrangement illegitimately directed sales transactions toward sympathetic brokerages, regardless of whether they offered the most competitive prices for transactions. Second, to encourage further investment in AllianceBernstein funds, Alliance paid excessive commissions to brokers in the form of "soft dollars." FN3 Though the Securities Exchange Act requires investment advisers to secure the lowest possible transaction price for trades, Section 28(e) includes a "safe harbor" provision, permitting higher commissions when an adviser has "determined in good faith that the amount of the commission is reasonable in relation to the value of the brokerage and research services provided." 15 U.S.C. § 78bb(e)(1) (2005). The Amended Complaint asserts that Alliance routinely paid excessive soft dollar commissions that violated the safe harbor provision of Section 28(e) so that the brokerages could "fund sales contests and other undisclosed financial incentives [to motivate brokers] to push AllianceBernstein Funds." (Am.Compl.¶ 152.)

> FN2. The Amended Complaint alleges that Alliance made undisclosed payments to the brokerage departments of Morgan Stanley,

> Smith Barney, Wachovia Securities, UBS Financial Services, Inc., Janney Montgomery Scott, Linsco Private Ledger, RBC Dain Rauscher, Chase Investment Services Corp., Ceridian Retirement Plan Services, FSC Securities Corporation, SunAmerica Securities, Bank One, National Planning Holdings, Inc., and Primerica Financial Services.

> FN3. Soft dollars are commissions "charged by brokerages to investment advisers in excess of the purchase and sale charges." (Am.Compl. ¶ 150.)

Alliance's payments to brokerages were in excess to the customary 12b-1 fees that may be used to legally market mutual funds. Section 12 of the ICA prohibits mutual funds from marketing their own shares unless certain enumerated conditions, set forth in Rule 12b-1, are met. These conditions include, *inter alia,* a written plan, a vote by the majority of the directors, and quarterly reports on the purpose of expenditures. In addition, the Rule explicitly requires that there be "a reasonable likelihood that the plan will benefit the company and its shareholders." 15 U.S.C. § 80a-35(a), (b) (2005). Plaintiffs maintain that Alliance failed to adhere to the requirements of Rule 12b-1 when making excessive payments to various brokerage firms.

Finally, the Amended Complaint alleges that these improper payments were made without shareholder knowledge. It characterizes the prospectuses of the Funds as "material[ly] false and misleading" (Am.Compl.¶ 156), allowing Defendants "to systematically skim millions of dollars from the investors." (Am.Compl.¶ 164.) Moreover, Plaintiffs argue that Alliance's Annual and Semi-Annual Reports did not reflect the illegitimate use of shareholder capital. By failing to disclose its practices, Plaintiffs assert that Alliance compromised its duty as a fiduciary to generate excessive management fees.

Plaintiffs organize the charges in the Amended Complaint as follows: *Count 1* accuses the Advisers and the Directors of making untrue statements and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 2677753 (S.D.N.Y.)
**(Cite as: Slip Copy)**

material omissions in the Funds' registration statements in violation of Section 34(b) of the ICA. *Count 2* accuses the Advisers, ABIRM, and the Directors of breaching their fiduciary duties in violation of Section 36(a) of the ICA. *Count 3* accuses the Advisers, ABIRM, and the Directors of receiving excessive compensation for managing the Funds in violation of their fiduciary duties under Section 36(b) of the ICA. *Count 4* contends the Advisers are liable as "control persons" of the Directors and ABIRM under Section 48(a) of the ICA. *Count 5* accuses the Advisers of committing fraud in violation of Section 206 of the IAA, entitling the Funds to rescind their advisory contracts with the Advisers under Section 215 of the IAA. *Counts 6* and *7* accuse the Advisers and the Directors of breaching their fiduciary duties to shareholders in violation of common law. *Count 8* accuses all Defendants of aiding and abetting a breach of fiduciary duty under common law. Finally, *Count 9* accuses all Defendants of unjust enrichment under common law.

### C. Standard of Review

**\*3** Rule 12(b)(6) provides for the dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6) (2000). A complaint should be dismissed only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). The court "must accept as true all of the factual allegations set out in the plaintiff's complaint, draw inferences from those allegations in the light most favorable to the plaintiff, and construe the complaint liberally." *Tarshis v. Riese Org.,* 211 F.3d 30, 35 (2d Cir.2000). Consequently, "the issue is not whether the plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Wright v. Ernst & Young LLP,* 152 F.3d 169, 173 (2d Cir.1998) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)).

### II. DISCUSSION

### A. Derivative Injuries Cannot Support a Direct Action

Plaintiffs bring direct claims for relief under Section 36(a) of the ICA, Section 34(b) of the ICA, and the common law of Maryland and Massachusetts. When deciding issues of "shareholder standing," that is, whether claims should be brought directly or derivatively, courts must look to the law of the fund's state of incorporation. *See Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 108-09 (1991). Here, all of the Funds in question were formed as either Maryland corporations or Massachusetts business trusts.

Maryland courts have clearly differentiated between claims that may be brought directly and those that must be brought derivatively. In describing Maryland law, the Second Circuit stated that:
[i]n deciding whether a shareholder may bring a direct suit, the question the Maryland courts ask is not whether the shareholder suffered injury; if a corporation is injured those who own the corporation are injured too. The inquiry, instead, is whether the shareholders' injury is "distinct" from that suffered by the corporation.

*Strougo v. Bassini,* 282 F.3d 162, 170 (2d Cir.2002). In *Strougo,* the court drew a logical distinction between the plaintiffs' two major claims for relief. First, the plaintiffs asserted that a recent equity offering was unfairly coercive because it disproportionately harmed shareholders who declined to participate in the offering. The Court permitted these direct claims because "the reduced value of [non-participating shareholder] equity did not derive from a reduction in the value of the Fund's assets, but rather from a reallocation of equity value to those shareholders who participate." *Id.* at 175. But in addressing the plaintiffs' standard equity dilution claims, the court held that "[u]nderwriter fees, advisory fees, and other transaction costs incurred by a corporation decrease share price primarily because they deplete the corporation's assets, precisely the type of injury to the corporation that can be redressed under Maryland law only through a suit brought on behalf of the corporation." *Id.* at 174.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*4** Massachusetts takes a similar approach in determining whether a shareholder may pursue a direct cause of action. Indirect harms, suffered generally by all shareholders, must be brought derivatively, on behalf of the corporation. *See Jackson v. Stuhlfire,* 28 Mass.App.Ct. 924, 925 (1990); *Bessette v. Bessette,* 385 Mass. 806, 809 (1982). For standard equity dilution claims, it is " the corporation that is the injured party, and it alone may sue the wrongdoer for the damage caused." *Hurley v. Federal Deposit Ins. Corp.,* 719 F.Supp. 27, 30 (D.Mass.1989). Accordingly, "[i]f a plaintiff alleges mismanagement of funds, embezzlement or breach of fiduciary duty resulting in a diminution of the value of the corporate stock or assets, the claim is one held by the corporation itself, and is thus derivative if brought by an investor." *Blasberg v. Oxbow Power Corp.,* 934 F.Supp. 21, 26 (D.Mass.1996).

The laws of Maryland and Massachusetts require dismissal of Plaintiffs' direct claims brought under Section 36(a) of the ICA, Section 34(b) of the ICA, and the common law of Maryland and Massachusetts. Any decrease in shareholder equity was simply the predictable consequence of a reduction in the overall value of the Funds. Also, the Amended Complaint contains no evidence demonstrating an unfair reallocation of shareholder equity or any other type of distinct injury. Plaintiffs' losses, therefore, cannot be redressed through a direct lawsuit and Counts 1, 2, and 6-9 must be dismissed.

### B. Section 36(b) Claim Against the Advisers May Proceed

Section 36(b) of the ICA grants private litigants an express right of action to enforce the fiduciary duties of investment advisers who charge excessive fees. FN4 To prove a violation of the statute, a plaintiff must establish that the fee is "so disproportionately large that it bears no reasonable relationship to the services rendered" and "could not have been the product of 'arm's length' bargaining." *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.,* 694 F.2d 923, 928 (2d Cir.1982), *cert. denied,* 461 U.S. 906 (1983). In making this

determination, courts must consider all relevant facts, including: (1) the nature and quality of the services provided by the advisers to the shareholders; (2) the profitability of the mutual fund to the adviser-manager; (3) "fall-out" benefits; (4) the economies of scale achieved by the mutual fund and whether such savings were passed on to the shareholders; (5) comparative fee structures; and (6) the independence and conscientiousness of the mutual fund's outside trustees. *See id.* at 929-30.

> FN4. Section 36(b) provides, in relevant part, that "the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services" and that an "action may be brought under this subsection by the [Securities and Exchange] Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser... ." 15 U.S.C. § 80a-35(b). But in pursuing a Section 36(b) claim, "the plaintiff in such a case need not first make a demand upon the fund's director before bringing suit." *Daily Income Fund, Inc. v. Fox,* 464 U.S. 526, 542 (1984).

At the dismissal stage, however, the Federal Rules of Civil Procedure simply require notice pleading. A complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief" giving "fair notice of what the plaintiff claim is and the ground upon which it rests. " Fed.R.Civ.P. 8(a) (2000); *see also Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 513 (2002); *Pfeiffer v. Bjurman, Barry & Assocs.,* No. 03 Civ. 9741, 2004 U.S. Dist. LEXIS 16924, at \*15 (S.D.N.Y. Aug. 26, 2004); *Wicks v. Putnam Inv. Mgmt., LLP,* No. 04 Civ. 10988, 2005 U.S. Dist. LEXIS 4892, at \*13 (D.Mass. Mar. 28, 2005). Plaintiffs' allegations against the Advisers exceed the baseline of specificity necessary to survive a motion to dismiss.

**\*5** The Amended Complaint provides concrete examples of fiduciary misconduct by the Advisers with respect to management fees. First, Plaintiffs

illustrate that as the size of the Funds increased, any savings generated by economies of scale were not passed on to shareholders. (Am.Compl.¶¶ 142-46.) FN5 In essence, Plaintiffs state a claim by demonstrating that they continued to pay escalating fees in exchange for absolutely no additional services. In enacting Section 36(b), Congress recognized "that as mutual funds [grow] larger, it [becomes] less expensive for investment advisers to provide additional services" and "wanted to ensure that investment advisers passed onto fund investors the savings that they realized from these economies of scale." *Migdal v. Row Price-Fleming Int'l, Inc.,* 248 F.3d 321, 326-27 (4th Cir.2001) (citing *Fogel v. Chestnutt,* 668 F.2d 100, 111 (2d Cir.1981)). The District Court of Massachusetts accepted this theory of liability, upholding a Section 36(b) claim because "the nature and quality of the services rendered by the defendants to the Funds [had] not substantially changed," creating "benefits from economies of scale which the defendants have failed to share with the Funds." *Wicks,* 2005 U.S. Dist. LEXIS 4892, at *3.

> FN5. Specifically, the Amended Complaint states that "despite the fact the net assets of the AllianceBernstein Growth & Income Fund increased from $1,503,874 to $3,003,001 during the Class Period, the net asset value per share of the fund decreased by 24.5%, falling from $3.44 in 1999 to $2.60 in 2003. Yet during the same period, expenses charged by Defendants increased, with the ratio of expenses to net assets jumping from 0.93% in 1999 to 1.22% in 2003." (Am.Compl.¶ 143.)

Plaintiffs also plead with particularity facts suggesting Alliance made recurring payments to brokers that were not in accordance with a valid Rule 12b-1 plan. The Amended Complaint describes how $27,787,103 was taken from the AllianceBernstein Premier Growth Fund and $41,391,766 was taken from the AllianceBernstein Growth and Income Fund without regard to the required conditions of Rule 12b-1. (Am.Compl.¶ 143.) In addition, it details the Adviser's system of

diverting soft dollars to brokers at the expense of shareholders. (Am. Compl. ¶¶ 150-53The Second Circuit ruled that such claims of excessive Rule 12b-1 fees are "cognizable," *Meyer v. Oppenheimer Mgmt. Corp.,* 764 F .2d 76, 82 (2d Cir.1985), and this Court has sustained similar allegations, reasoning that "excessive promotion, distribution and servicing fees" meet the pleading requirements of Section 36(b). *Pfeiffer,* 2004 U.S. Dist. LEXIS 16924, at *15.

Questions concerning the independence of the directors of the Funds also militate against dismissal. *See Gartenberg,* 694 F .2d at 929-30. The Amended Complaint states that "key AllianceBernstein Funds Directors were employees or former employees of the [Advisers] and were beholden for their positions, not to AllianceBernstein Funds investors, but rather, to the [Advisers] they were supposed to oversee." (Am.Compl.¶ 124.) For example, Defendant Carifa served as the President, Chief Operating Officer, and Director of ACMC while simultaneously serving as a trustee or director of several of the Funds. (Am.Compl.¶ 126.) Such practices create a reasonable inference, especially at this stage of litigation, that the fee arrangements between the Funds and their investment advisers might not have been the result of rigorous arms-length negotiations.

**\*6** The Advisers respond that Plaintiffs' Section 36(b) claims are conclusory, speculative, and must be dismissed. (Defs.' Resp. 15-16.) Relying on this Court's decision in *Yampolsky v. Morgan Stanley Inv. Advisers Inc.,* No. 03 Civ. 5710, 2004 U.S. Dist. LEXIS 8573 (S.D.N.Y. May 12, 2004), they contend that Plaintiffs do not allege any facts demonstrating that the advisory fees were disproportionately large to the services rendered. Yet the plaintiffs in *Yampolsky* relied "heavily on generalities about deficiencies in the securities industry" and "statements made by industry critics and insiders." *Yampolsky,* 2004 U.S. Dist. LEXIS 8573, at *5. The Advisers also cite to *In Re Eaton Vance Mutual Funds Fee Litigation,* No. 04 Civ. 1144, 2005 U.S. Dist. LEXIS 15731 (S.D.N.Y. July 29, 2005) in support of dismissal. The Court in *Eaton Vance,* however, determined that the

Slip Copy, 2005 WL 2677753 (S.D.N.Y.)
**(Cite as: Slip Copy)**

plaintiff's allegations "contain no specific facts that would demonstrate that the compensation paid to the defendants was disproportionate to the services rendered." *Id.* at *3. As previously indicated, the Amended Complaint pleads far more than conclusions of fact, making it premature at this stage to dismiss Plaintiffs' claim for relief against the Advisers under Section 36(b). FN6

> FN6. The text of Section 36(b) states that " [n]o award of damages shall be recoverable for any period prior to one year before the action was instituted." 15 U.S.C. § 80a-35(b)(3). Therefore, Plaintiffs' Section 36(b) claims against the Advisers are limited to this time period.

### C. Remaining Section 36(b) & 48(a) Claims Are Dismissed

Plaintiffs also pursue Section 36(b) claims against the Directors and ABIRM. Section 36(b) authorizes a shareholder action against an investment adviser " or any affiliated person of such investment advisor" for "breach of fiduciary duty in respect of ... compensation." 15 U.S.C. § 80a-35(b). The statute specifically lists directors and underwriters as the type of "affiliates" that may be found liable. However, the statute also mentions that "no such action shall be brought or maintained against any person other than the recipient of such compensation." *Id.* § 80a-35(b)(3). Therefore, the threshold question is whether the Directors and ABIRM are alleged to have received excessive compensation while functioning as "affiliate" investment advisers.

Plaintiffs' Section 36(b) claim against ABIRM must be dismissed because Plaintiffs have not pled any facts demonstrating it was the recipient of excessive advisory fees. *See In re TCW/DW N. Am. Govt. Income Trust Sec. Litig.,* 941 F.Supp. 326, 343 (S.D.N.Y.1996) (dismissing claim for failure to plead facts showing that a distributor was the recipient of excessive compensation for advisory services). The Amended Complaint conflates vague charges against ABIRM with more specific charges against the Advisers, who clearly received advisory

fees. (Am.Compl.¶ 210.) Therefore, Plaintiffs' allegations against ABIRM fail to reach the level of specificity required to survive a motion to dismiss.

Plaintiffs' claims against the Directors fail for similar reasons. The Amended Complaint alleges that the Directors dishonestly acquiesced to paying excessive advisory fees while receiving a director's salary "in very large amounts." (Am.Compl.¶ 209.) Yet Plaintiffs strain to describe the process by which the Directors received excessive compensation for advisory services. *See Jerozal v. Cash Reserve Mgmt., Inc.,* No. 81 Civ. 1569, 1982 U.S. Dist. LEXIS 16566, at *18-19 (S.D.N.Y. Aug. 10, 1982) (dismissing claim against directors for failure to demonstrate they received any portion of advisory fees); *Tarlov v. Paine Webber Cashfund, Inc.,* 559 F.Supp. 429, 436 (D.Conn.1983) (holding that "only the recipient of allegedly excessive compensation can be sued"). *But see Halligan v. Standard & Poor's/Intercapital, Inc.,* 434 F.Supp. 1082, 1084 (E.D.N.Y.1977) (permitting claims against directors for the indirect receipt of compensation). Along these lines, Plaintiffs' pleadings fail to delineate how the basic compensation packages of the Directors can be accurately characterized as advisory commissions.

**\*7** Though doctrinal guidance in this area of the law remains inconsistent, the legislative history of Section 36(b) reinforces the Court's decision to dismiss Plaintiff's actions against the Directors and ABIRM. The Senate Report accompanying Section 36(b) explains that the statute "affords a remedy if the investment adviser should try to evade liability by arranging for payments to be made not to the adviser itself but to an affiliated person of the adviser." S.Rep. No. 91-184, at 16 (1969), *reprinted in* 1970 U .S.C.C.A.N. 4897, 4910-11. Thus, Congress intended that Section 36(b) assist in the enforcement of the fiduciary duties of investment advisors "by tracing compensation or payment for advisory services to the ultimate beneficiary." *Jerozal,* 1982 U.S. Dist. LEXIS 16566, at *18-19. Here, the Amended Complaint does not allege claims against the Directors and ABIRM as a method of tracing advisory fees through the corporate apparatus to enforce underlying claims against the Advisers. As a result,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Plaintiffs' Section 36(b) claims against ABIRM and the Directors are properly dismissed.

Finally, Plaintiffs' claim against the Advisers, brought under Section 48(a) of the ICA, is also dismissed. Without a surviving violation of the ICA by the Directors or ABIRM, the Advisers cannot be held secondarily liable as "control persons" of either of these two defendants. *See In re Merrill Lynch & Co. Research Reports Sec. Litig.,* 272 F.Supp.2d 243, 264 (S.D.N.Y.2003).

### D. Plaintiffs' Demand Failure Is Not Excused

Plaintiffs' contract rescission claim, brought under Section 215 of the IAA, is dismissed for failure to meet the exacting demand futility requirements of the states of Maryland and Massachusetts. In Section 215 cases, a plaintiff must allege a separate underlying violation of the IAA. FN7 Here, Plaintiffs accuse the Advisers of engaging in fraudulent business practices, in violation of Section 206 of the IAA. FN8 Because this claim is pursued derivatively, Plaintiffs must demonstrate that they have made direct appeals to the Funds' directors, or, in the alternative, that such efforts would have been futile.

> FN7. Section 215 provides that "[e]very contract made in violation of any provision of this title ... shall be void." 15 U.S.C. § 80b-15 (2005).

> FN8. Section 206 of the IAA makes it unlawful for an investment adviser "to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." 15 U.S.C. § 80b-6 (2005).

Federal Rule of Civil Procedure 23.1 sets forth the demand requirements of derivative lawsuits. When pursuing a cause of action on behalf of a corporation, a complaint must:
allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires

from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action for not making the effort.

Fed.R.Civ.P. 23.1 (2000). Because Plaintiffs concede that no demands were made, they must demonstrate that such action would have been futile. In making this determination, courts must apply the law of the fund's state of incorporation. *See Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 108-09 (1991).

The Maryland Court of Appeals has described the requisite pleading standard to excuse demand. In *Werbowsky v. Collomb,* 362 Md. 581 (Md.2001), the court indicated that excusal is appropriate only in instances where "a majority of the directors are so personally and directly conflicted or committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule." *Id.* at 144. The court emphasized the importance of the demand requirement, stressing that excusal is appropriate "only when the allegations or evidence clearly demonstrate" futility "in a very particular manner." *Id.* Applying this doctrine, the court refused to excuse the plaintiffs' demand failure "simply because a majority of the directors ... are conflicted or are controlled by other conflicted persons, or because they are paid well for their services as directors, were chosen as directors at the behest of controlling stockholders, or would be hostile to the action." *Id.* at 143-44.

**\*8** The Second Circuit has applied the *Werbowsky* framework to assess whether demand failure may be excused as futile. In *Scalisi v. Fund Asset Mgmt., L.P.,* 380 F.3d 133 (2d Cir.2004), the plaintiffs based their futility arguments on the fact that the directors of the Merrill Lynch Focus Twenty Fund, Inc. were appointed by the fund's investment adviser and were therefore beholden to it for their large salaries. *Id.* at 136-37. The Second Circuit, however, would not excuse the plaintiffs' failure to make a demand, noting "the importance of the demand requirement even when a director 'would be hostile to the action.' " *Id.* at 141. The court's opinion underscored the usefulness of the demand

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 2677753 (S.D.N.Y.)
**(Cite as: Slip Copy)**

requirement in providing "directors-even interested, non-independent directors-the opportunity to consider, or reconsider, the issue in dispute." *Id.* at 141 (citing *Werbowsky,* 362 Md. at 144).

Plaintiffs' allegations do not satisfy the futility standards of Maryland law. The Amended Complaint merely states that the directors of the Funds in question were appointed by the Advisers and were therefore beholden to them for their positions and compensation packages. (Am.Compl. ¶ 182.) *Scalisi,* in applying the *Werbowsky* standards of Maryland law, held that such generalized accusations are insufficient. *Scalisi,* 380 F.3d at 141. While the directors of the Funds might have been hostile to pre-suit demands, it is certainly possible that making a demand would have triggered an honest reconsideration of the existing fee arrangement. Consequently, Plaintiffs' contract rescission claim is dismissed with respect to the nine Funds incorporated in Maryland.

Plaintiffs also fail to meet the futility requirements of Massachusetts. Excusal is appropriate when "a majority of directors are alleged to have participated in wrongdoing, or are otherwise interested." *Harhen v. Brown,* 431 Mass. 838, 730 N.E.2d 859, 865 (Mass.2000). Though the Massachusetts Supreme Court has employed the ALI Principles of Corporate Governance in defining the term "interested," *id.* at 842-43, other courts have utilized the ICA's definition section, as mandated by statute. FN9 *E.g., In re Eaton Vance Mutual Funds Fee Litig.,* 380 F.Supp.2d 222, 239-40 (S.D.N.Y.2005); *In re Mut. Funds Inv. Litig.,* No. 04 Civ. 15863, 2005 U.S. Dist. LEXIS 18082, at *15 (D.Md. August 25, 2005). Regardless of which definition is employed, both approaches seek to ascertain whether the directors in question were subject to improper control by their investment adviser. FN10

> FN9. The Annotated Laws of Massachusetts state that a "trustee of a trust who with respect to the trust is not an interested person, as defined in said Investment Company Act of 1940, shall be deemed to be independent and

disinterested when making any determination or taking any action as trustee." Mass. Gen. Laws ch. 182 § 2B (2005).

> FN10. The ALI Principles of Corporate Governance define the term "interested" as "subject to a controlling influence by a party to the transaction" that "could reasonably be expected to affect the director's or officer's judgment with respect to the transaction or conduct in a manner adverse to the corporation." 1 ALI Principles of Corporate Governance: Analysis and Recommendations § 1.23(a)(4) (1994). Similarly, the ICA states that an "interested person" is an " affiliate," which is defined as "any person directly or indirectly controlling, controlled by, or under common control with, such other person." 15 U.S.C. § 80a-2(a)(19), (3) (2005).

Plaintiffs' pleadings fail to adequately describe how the Advisers exerted such control over the Funds' directors as to make a majority of them "interested" in the fee transactions at issue. First, the Amended Complaint suggests that the directors "were captive to and controlled by" the investment advisers because the investment advisers appointed them. (Am.Compl.¶ 182.) Mere appointment by the " controlling" agent, however, has been routinely rejected by both state and federal courts as inadequate evidence of futility. *See In re Eaton Vance,* 380 F.Supp.2d, at 239-40; *Demoulas v. Demoulas Super Mkts., Inc.,* No. 03 Civ. 3741, 2004 Mass.Super. LEXIS 286, at *41 (Mass.Super.Ct. Aug. 2, 2004). Next, Plaintiffs maintain the directors "approved" or "allowed" the undisclosed payments and are unlikely to sue themselves on behalf of the corporation. (Am.Compl.¶¶ 184-85, 189.) But courts have also consistently rejected director acquiescence as insufficient evidence of futility, *see ING Principal Prot. Funds Derivative Litig.,* 369 F.Supp.2d 163, 172 (D.Mass.2005); *Grossman v. Johnson,* 89 F.R.D. 656, 659 (D.Mass.1981); *In re Kauffman Mut. Fund Actions,* 479 F.2d 257, 265 (1st Cir.1973), and have declined to excuse demand

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

failure based on an unlikelihood that a board of directors will sue themselves on behalf of the corporation. *See In re Eaton Vance,* 380 F.Supp.2d at 239-40; *Heit v. Baird,* 567 F.2d 1157, 1162 (1st Cir.1977); *In re Kauffman,* 479 F.2d at 265. Thus, Massachusetts law requires the dismissal of Plaintiffs' remaining Section 215 claims for failure to make a proper demand.

### E. No Standing to Sue on Behalf of Non-Owned Funds

**\*9** The named Plaintiffs do not have standing to sue on behalf of forty-eight AllianceBernstein mutual funds in which they do not own shares. Article III of the United States Constitution requires that the plaintiff (1) have a personal injury; (2) that is fairly traceable to the defendants' allegedly unlawful conduct; and (3) is likely to be addressed by the requested relief. *Allen v. Wright,* 468 U.S. 737, 751 (1984). The Supreme Court has also indicated:
[t]hat a suit may be a class action ... adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.

*Lewis v. Casey,* 518 U.S. 343, 357 (1996). Plaintiffs' only claim surviving dismissal, the Section 36(b) claim against the Advisers, has been properly brought on behalf of the thirteen Funds in which they own shares. However, Plaintiffs also bring claims against the Advisers of forty-eight Funds in which they do not own shares.

Traditionally, district courts have resolved issues involving Article III standing before addressing class certification. *See In re Eaton Vance Corp. Sec. Litig.,* 220 F.R.D. 162, 165-66 (D.Mass.2004). Appellate courts have generally approved of this practice, underscoring justiciability as an "inherent prerequisite to the class certification inquiry." *See Rivera v. Wyeth-Ayerst Labs.,* 283 F.3d 315, 319 n. 6 (5th Cir.2002); *Easter v. Am. W. Fin.,* 381 F.3d 948, 962 (9th Cir.2004) (stating that the "district court correctly addressed the issue of standing

before it addressed the issue of class certification"). But the Supreme Court has departed from this general rule in the context of complex class action litigation. *See Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 831 (1999). In unique cases where class certification issues are "logically antecedent" to standing issues and the result of a class certification motion is "dispositive" of the case as a whole, it may be appropriate to decide class certification first. *See id.* at 612-13. But in its decisions, the Court has stressed that this exception should only applied when a court is confronted with an extremely complex case defying customary judicial administration. *See id.* at 823 (characterizing *Ortiz* as a case brought in the context of an "asbestos litigation crisis").

Based on this guidance, it would be inappropriate for the court to proceed directly to a class certification inquiry before resolving the issue of justiciability. As a straightforward securities case, many of the concerns triggering the exception mentioned by the Supreme Court in *Ortiz* are noticeably absent here. In fact, in the arena of securities litigation, standing requirements have been considered particularly important "in order to curb the risks of vexatious litigation and abuse of discovery." *In re Bank of Boston Corp. Sec. Litig.,* 762 F.Supp. 1525, 1531 (D.Mass.1991). Moreover, because Plaintiffs clearly have standing to sue on behalf of the thirteen Funds in which they own shares, addressing class certification would not be outcome determinative. *See Pederson v. La. State Univ.,* 213 F.3d 858, 866 n. 5 (5th Cir.2000); *Clark v. McDonald's Corp.,* 213 F.R.D. 198, 204 (D.N.J.2003). Thus, the Court will table its class certification inquiry until that issue is fully briefed by the parties.

**\*10** Turning to the issue of standing, Plaintiffs may not pursue Section 36(b) claims on behalf of the Funds in which they do not own shares. First, because the named Plaintiffs have not purchased shares in the forty-eight Funds at issue, they cannot establish injuries caused by the advisers of those Funds. *See In re Eaton Vance Corp. Sec. Litig.,* 219 F.R.D. 38, 41 (D.Mass.2003) (dismissing claims for lack of standing against two mutual funds in which plaintiff did not own shares). Without the requisite

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 2677753 (S.D.N.Y.)
**(Cite as: Slip Copy)**

demonstration of an injury, "none [of the named Plaintiffs] may seek relief on behalf of himself or any other member of the class." *O'Shea v. Littleton,* 414 U.S. 488, 494 (1974). This conclusion is strengthened by a literal reading of the text of Section 36(b), which states that an action may only be brought by either the SEC "or by a *security holder of such registered investment company."* 15 U.S.C. § 80a-35(b)(3) (emphasis added).

Plaintiffs attempt to establish the existence of an injury by alleging that they have an "ongoing financial interest" in the forty-eight Funds in which they do not own shares. However, the only relevant authority cited by Plaintiffs on behalf of this proposition is *Batra v. Investors Research Corp.,* No. 89 Civ. 0528, 1991 U.S. Dist. LEXIS 14773 (W.D.Mo. October 4, 1991). In *Batra,* the court determined that the plaintiffs had standing to sue the directors of funds in which they did not own shares, in large part, because management fees were assessed at the investment company level, rather than the portfolio level. *See id.* at *8 (distinguishing *Verrey v. Ellsworth,* 303 F.Supp. 497 (S.D.N.Y.1969)). Though each of the Funds at issue share a common investment adviser, they are incorporated separately and management fees "are incurred at the portfolio level." (Am.Compl.¶ 65.) As a result, Plaintiffs do not have a stake in the financial health of portfolios in which they do not own shares and may not pursue Section 36(b) claims on their behalf.

### III. CONCLUSION

Defendants' motion to dismiss is granted in part and denied in part. Each of Plaintiffs' claims, except for those against the Advisers under Section 36(b) of the ICA, are dismissed. Plaintiffs, however, may pursue their Section 36(b) claims only on behalf of the thirteen Funds in which they own shares. The Court reserves judgment on Plaintiffs' request for leave to amend. Plaintiffs should submit a letter to the Court by November 2, 2005 providing a more complete justification for why leave should be granted.

SO ORDERED.

S.D.N.Y.,2005.
In re Alliancebernstein Mut. Fund Excessive Fee Litigation
Slip Copy, 2005 WL 2677753 (S.D.N.Y.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.